UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
ROBERT CRAWFORD, WILLIAM ETSCH,
ROBERT GOBBO, TRACEY CACACE, MICHAEL
CRUZ, DAVID COLLINS, TROI MOSBY, and
SHAWN MILLER,

                        **MEMORANDUM & ORDER**

           Plaintiffs,             Civil Action No. 12-3850

    -against-

CORAM FIRE DISTRICT, THOMAS LYON,
Individually and in his capacity as Coram Fire
District's Chairman of the Board, VANDORN
JOHNSON, Individually and in his capacity as
Coram Fire District's Commissioner, JEROME
A. DELLI BOVI, Individually and in his capacity as
Coram Fire District's Commissioner, STEVEN
YALLAMAS, Individually and in his capacity as
Coram Fire District's Commissioner, TIMOTHY
HEIDRICH, Individually and in his capacity as
Coram Fire District's Commissioner,

           Defendants.
----------------------------------------------------------------X
**APPEARANCES:**

**For Plaintiffs:**
Franklin, Gringer & Cohen, P.C.
666 Old Country Road, Suite 202
Garden City, NY 11530-2013
By:    Joshua Marcus, Esq.
        Brian Klein, Esq.

**For Defendants:**
O'Rourke & Hansen, PLLC
235 Brooksite Drive, Suite 300
Hauppauge, New York 11788
By:    James J. O'Rourke, Esq.

**HURLEY, Senior District Judge:**

       Plaintiffs, eight former full-time emergency medical services ("EMS") workers for

defendant Coram Fire District (the "District") commenced this action asserting claims under the

Fair Labor Standards Act, 29 U.S.C. § 201 et seq.  and the New York Labor Law.  Presently

before the Court is plaintiffs' motion for summary judgment and defendants' motion to

consolidate and for partial summary judgment.  For the reasons set forth below, both motions are

granted in part and denied in part.

<strong>BACKGROUND</strong>

The following facts are undisputed unless otherwise noted.

## I.     Parties

Plaintiffs Robert Crawford ("Crawford"), William Etsch ("Etsch"), Robert Gobbo

("Gobbo"), Tracey Cacace ("Cacace"), Michael Cruz ("Cruz"), David Collins ("Collins"), Troi

Mosby ("Mosby") and Shawn Miller ("Miller") (collectively "Plaintiffs") were all employed by

the District as EMS workers at least from August 3, 2006 through July 2010.  (DE 37 ¶¶ 33-39.)

They reported to the District Manager Salvatore Giarrizzo ("Giarrizzo").  As District Manager,

Giarrizzo was responsible for overseeing employees.   (*Id.* at ¶¶ 15-19.)  Patricia Wood

("Wood"), District treasurer, was in charge of the District's payroll and finances.  (*Id.* at ¶¶ 26,

28-29.)

Both Wood and Giarrizzo reported to the District's Board of Commissioners.  (*Id.* at ¶¶

17, 26.) At all relevant times, the District's Board was comprised of defendants Thomas Lyon

("Lyon"), Vandorn Johnson ("Johnson"), Jerome A. Delli Bovi ("Delli Bovi"), Steven Yallamas,

("Yallamas"), and Timothy Heidrich ("Heidrich") (collectively "Individual Defendants") (the

District and the Individual Defendants are collectively referred to as "Defendants"). (*Id.* at ¶ 1.)

## II.     EMS Scheduling

Typically, two full-time EMS workers would be scheduled to work a specific shift.  EMS

2

employees[1] worked a 4-day on/ 4 day off schedule, i.e. they would work four days straight and then have four days off. (*Id.* at ¶ 43.) As a result of this schedule, there would be weeks when EMS employees worked only three days a week. Specifically, subject to vacation and other leave, as wells as "mutuals," EMS employees would work eight shifts during two biweekly periods (four weeks), then work six shifts for the next two bi-weekly periods, then again work eight shifts during the next two bi-weekly periods, etc. (*Id.* at ¶¶49-50.) A mutual is when one EMS worker would swap a shift or shifts with another EMS worker. EMS workers were permitted to do mutuals subject to the approval of the District Manager. A log book was kept which indicated when mutuals were taken. It appears these log books were not preserved. (*Id.* at ¶¶ 51-52.)

III.    **Length of Shifts**

When the District first began its EMS program in 2002, EMS employees worked nine-hour shifts. In a typical bi-weekly pay period, an EMS worker would work 72 hours if they worked 8 days during that period and 54 hours if they only worked 6 days. According to the employee handbook, EMS workers would receive overtime after 36 hours while other employees would receive overtime after 40 hours. (*Id.* at ¶¶ 54-56.)

By memorandum dated June 16, 2006, EMS employees were advised that effective June 25, 2006, their shifts would be 12 hours. The memorandum noted that with the four day on/ four day off rotation, the workweek would be changed from 36 hours to 48 hours and that overtime would only be paid after 48 hours. The change to twelve hours shifts came at the request of EMS employees as they wanted more hours; it was approved by the Board of Commissioners. Thus,

---

[1] References in this opinion to EMS employees or EMS workers are to full time EMS workers unless the Court specifically refers to per diem EMS employees.

3

EMS employees who worked eight days during a bi-weekly period were paid ninety-six hours straight time.  (*Id.* at ¶¶ 57-65.)

## IV.     Timekeeping of EMS Hours

EMS employees initially used a punch clock to have their time monitored.  The district manager signed the initial punch cards in 2002.  The treasurer circled the hours on the punch time cards.  (*Id.* at ¶¶- 76.)  Shortly thereafter, EMS employees were asked to fill out written time cards in which they filled in the days and hours worked.  The district manager reviewed and initialed the written time cards and then gave them to the treasurer in a package for payroll.  The record contains varying explanations for why  EMS workers were switched from punch-in time sheets to hand written ones.  All other District employees continued to used punch time cards. (*Id.* at ¶¶ 77-79.)

According to Plaintiffs, each of them, with the exception of Miller, were told by the district manager how to fill-out their time cards shortly after they were hired and that their written time cards should total seventy-two hours.  Thus, the written time cards submitted to the District did not always set forth the actual days worked by EMS employees.  (*Id.* at ¶¶85-89.) Giarrizzo, the district manager, denies he ever told EMS employees to write 72 hours on their time cards.  (*Id.* at ¶ 92.)  He did, however, issue memoranda on the topic.  One memorandum dated December 17, 2002 stated that "Time Cards *must* match the work schedule calendar regardless if it is a mutual.  The logbook will reflect mutual and day physically worked."  A second memorandum dated January 30, 2003 stated "At the end of your 14 day rotation, all cards are to equal 72 hours."  Giarrizzo also issued other memoranda stating EMS employees would be docked a full day for failing to produce a worksheet but there is no evidence anyone was so

4

docked.  (*Id.* at ¶¶ 93-95; 103-07.)

Plaintiffs testified that their time cards do not reflect "overtime" they worked, i.e. time in excess of their scheduled shift, and do not reflect when mutuals were taken. (*Id.* at ¶¶ 101-02.)

As a result of a State Comptroller's audit issued in the summer of 2009, EMS employees were advised that punch time cards would be required beginning September 13, 2009.  After this change back to the punch clock, EMS employees were paid only for the hours they actually worked.  (*Id.* at ¶¶ 109, 112-13.)

## V.    Overpayments to EMS Employees

Shortly before Labor Day of 2009, Crawford approached the treasurer, Patricia Wood, and asked what would happen to the "ghost day" when they started to use the punch clock. Wood did not know what that meant.  Crawford explained that every other pay period they would have eight days off and work 72 instead of 96 hours but would be paid for 96 hours; he said he was told to fill out the written time sheets like that by Giarrizzo.  Wood replied she did not know what was going on and then contacted Delli Bovi.  (*Id.* at ¶ 114.)

When contacted by Wood, Delli Bovi said he did not know what she was talking about and he would contact the other commissioners.  He did and a meeting was held within forty-eight hours. (*Id.* at ¶ 115.)

Thereafter, the treasurer went through some EMT employee payroll records and presented them to the Individual Defendants.  It was determined that they needed professional assistance to determine the size and scope of the problem.  District accountants were directed to undertake a full and in depth examination of the books and records and determine the extent of the practice and the amount of money involved.  An attorney was also hired to investigate and recommend

action if it was determined the allegation of the submission of false time cards in order to be paid for time not worked was substantiated. The record does not contain the date the district accountants were directed to undertake an examination; nor does it contain the date the attorney was hired. There is, however, a May 31 letter drafted by the District Accountants in which they calculated the amount of overpayments to EMS employees. The attorney gave the Defendants an oral report, the date of which is not in the record. On June 8, 2010 the attorney met with EMS personnel and advised them they would face the prospect of civil service charges if they did not agree to pay back the money they received for days not worked. (*Id.* at ¶¶143-45.)

Employees of the District and the Commissioners each receive a free turkey for Thanksgiving. In November 2009, a memo was issued under Giarrizzo's name that stated the current full-time EMS workers would not receive a turkey. Giarrizzo does not remember issuing the memo. (*Id.* at ¶¶131-133.)

**VI.     EMS Employees Go to the U.S. Department of Labor**

On May 5, 2010, Etsch filed a complaint against the District with the United States Department of Labor for failure to pay overtime. (*Id.* at ¶¶ 135.) The record does not contain the date that the Defendants learned of the complaint. On December 22, 2010, the District settled the complaint and agreed to pay the amount sought by the Department of Labor for overtime due EMS employees for the period July 5, 2008 through July 3, 2010. (*Id.* at ¶137.)

**VII.    Civil Service Charges and State Court Action**

In or about September 2010, the District filed Civil Service Charges against all its full time EMS employees alleging theft of District funds, falsifying District records and offering false documents for filing with the District. All of the EMS employees resigned before hearings on

6

the charges were held and the District did not follow through with the charges after their resignations.  (*Id.* at ¶¶147-50.)

On November 15, 2010 the District filed an action in the Supreme Court of the State of New York, County of Suffolk against all of its former full-time EMS employees alleging that they had illegally converted District funds by submitting time cards for hours not worked (the "State Court Action").  (*Id.* at ¶¶ 151-52.)

**VIII.   Vacation, Sick, and Holiday Pay**

While some EMS employees received "vacation and/or sick pay" when they left the District's employ, others did not.  (*Id.* at ¶ 156.)  The District's Handbook contains the following relevant provisions regarding vacation pay:

> 6.3   Vacation time shall be taken only in the calendar year in which it was earned.  Vacation time shall not be accrued form [sic] year to year.
>
> . . .
>
> 6.8   Any eligible employee who is laid off, discharged, retired or voluntarily separated from service with the District shall be compensated for accrued vacation time if due in that year of employment.

(DE 38-38 (Marcus Aff. Ex. R) at pp. 9-10.) Regarding sick pay, the Handbook provides: "Unused sick leave shall accrue from year to year with a maximum of 120 days.[] Employees are encouraged to allow their sick time leave to accrue as protection against a serious illness causing lost time without pay."  (*Id.* at p. 11).  Unlike the vacation policy, the sick day policy does not have a provision regarding payment of sick time upon separation from service.  (*See id.*)  Finally, the Handbook lists eleven paid Holidays and, with respect to EMS workers, states that they "shall be paid semi-annually for all holidays listed . . .  January and July."  (*Id.* at p. 8.)

7

**DISCUSSION**

**I.      Summary Judgment Standard**

Summary judgment, pursuant to Rule 56, is appropriate only where admissible evidence

in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence

of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law.

*See Viola v. Philips Med. SYS. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994).  The relevant

governing law in each case determines which facts are material; "[only disputes over facts that

might affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  No genuinely

triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and

submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the

non-movant, that no rational jury could find in the non-movant's favor.  *Chertkova v. Conn. Gen'l*

*Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion properly supported by affidavits, depositions, or

other documentation, the non-movant must offer similar materials setting forth specific facts that

show that there is a genuine issue of material fact to be tried.  *Rule v. Brine, Inc.*, 85 F.3d 1002,

1011 (2d Cir. 1996.  The non-movant must present more than a "scintilla of evidence," *Del. &*

*Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (*quoting Anderson*, 477

U.S. at 252) (internal quotation marks omitted), or "some metaphysical doubt as to the material

facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (*quoting Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal quotation marks

omitted), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on

"mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing Anderson, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination[s] of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Id. at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.' " Id. at 211 (citing *Matsushita*, 475 U.S. at 587).

## II.  Overview of Discussion

The Court's discussion shall proceed in the following manner.  First, the Court shall address Plaintiffs' motion for summary judgment on liability for their state law overtime claim. The Court shall then proceed to the claim for unpaid sick, vacation and holiday pay, and continue on to Plaintiffs' retaliation claims under the FLSA and New York Labor Law.  Next, Defendants' motion for summary judgment shall be addressed.  Finally, the Court will consider the motion to consolidate the District's state court action with this action.

## III.  Plaintiffs' Claim for Overtime Under New York Law

New York law requires that employees who work more than forty hours per week be

compensated for overtime work at a rate of one and one-half times their regular rate of pay for all time worked in excess of forty hours.  12 N.Y.C.R.R. 142-2.2.

Here there is no question but that once the Plaintiffs' schedule was changed to 12 hour shifts effective June 26, 2006, there were weeks they worked more than 40 hours but were not paid overtime.  That the exact amount due is in dispute does not preclude summary judgment as to liability.  Factual issues as to matters such as the number of hours actually worked each week, and whether or not Plaintiffs were paid overtime for less than one half hour can be resolved at a damages trial.

That there is liability for overtime does not, however, end the matter.

Plaintiffs have already received overtime for the periods July 5, 2008 through July 3, 2010 pursuant to their complaints with the U.S. Department of Labor.  (DE 36 at p. 17 n.18.) According to Plaintiffs, by this motion they are seeking a determination of liability only for overtime "pursuant to the NYLL for the remainder of the six years prior to the filing of the Complaint - from August 3, 2006 through September 2009 (the date the District changed back to the punch-card system) along with liquidated damages."  (*Id*.; DE 41 at p. 3.)

The instant action was filed on August 3, 2012.  As overtime claims under the New York Labor Law have a six year statute of limitations, *see* N.Y. Labor Law §198(3), any claims prior to August 3, 2006 are barred.  Given that plaintiffs have already recovered overtime for the period July 5, 2008 through July 3, 2010, the only time period of liability vis a vis the amount owed for overtime is from August 3, 2006 to July 5, 2008.  *See Ghosh v. Neurological Serv. of Queens*, 2015 WL 431807, * 2 ( E.D.N.Y. Feb. 3. 2015) (a plaintiff may not recover twice for the same injury to the extent recovery may be had under both federal and state law).  Moreover, as

discussed *infra*, liability is limited to the District as the evidence on this motion does not permit a finding that the Individual Defendants are "employers."

To the extent that Plaintiffs are seeking a determination of liability for liquidated damages equaling 100 percent of any wages later determined to be owed, their motion is denied without prejudice. The Labor Law provision allowing for liquidated damages equaling 100 became effective April 9, 2011. N.Y. Law 2010, c. 564, §7; *see Lopez v. Yossi's Heimishe Bakery Inc.*, 2015 WL 1469619, *10 (E.D.N.Y. March 30, 2015). As neither party has briefed the issue of liquidated damages under the Labor Law provision in effect at the time of the violation it is inappropriate for the Court to address it.

To summarize, Plaintiff's motion for summary judgment on their overtime claim is granted for liability for overtime wages due for the period August 3, 2006 to July 5, 2008 as against the District.

**IV.    Plaintiffs' Claim for Vacation, Sick and Holiday Pay**

"It is axiomatic that an employee has no inherent right to paid vacation and sick days, or payment for unused vacation and sick days, in the absence of an agreement, either express or implied." *Litras v. PVM Intern. Corp.*, 2013 WL 4118482, *10 (Aug. 15, 2013) (quotations omitted). Under section 198–c(1) of New York's Labor Law "any employer who is a party to an agreement to pay or provide benefits or wage supplements to employees" must pay the amounts owed within thirty days of the date due. *See* N. Y. Labor Law § 198–c(1). "This section codifies the general understanding that vacation and sick pay are purely matters of contract between an employer and employee." *Litras*, 2013 WL 4118482, at * 10. Accordingly, to prevail on their claim that they are owed accrued vacation, sick and holiday pay, Plaintiffs must demonstrate the

11

existence of an agreement entitling them to such pay upon separation from service. *Id.*; *see also*

*Gennes v. Yellow Book of N.Y., Inc.*, 23 A.D.3d 520, 522, 806 N.Y.S.2d 646 (2d Dep't 2005)

("The primary and dispositive issue in applying [Section 198–c(1) ] is whether there was any

basis for the accrual of vacation benefits."); *Glenville Gage Co. v. Indus. Bd. of Appeals*, 70

A.D.2d 283, 284, 421 N.Y.S.2d 408 (3d Dep't 1979) (stating that "the accrual of vacation[ ][pay]

... [is] a matter of agreement to provide such benefits," and citing both the employer's written

notice and the employee's testimony to determine the terms of the agreement as it related to

accrued vacation pay).

    As set forth in the District's Handbook, "vacation time shall not be accrued [from] year to

year" and an employee who separates from service "shall be compensated for accrued vacation

time if due in that year of employment."   In contrast, the Handbook permits the accrual of up to

120 days[2] of sick time but does not provide for payment of any sick time upon separation.  Based

upon the District Handbook, a departing employee would be entitled to payment for any vacation

accrued but unused in the last year of employment but not for any sick or personnel days.

    Plaintiffs' assert a "custom" of providing departing employees "with accrued but unused,

sick and/or vacation pay." (DE 36 at p. 19)   As noted above, vacation accrued in the year of

departure is payable under the terms of the Handbook.  With respect to unused vacation for prior

years and any accrued sick time, the evidence cited by Plaintiffs does not support the claim of

custom.  Plaintiffs' 56.1 Statement (DE 37) asserts that "some of the EMS workers received sick

and/or vacation pay when they left."  (*Id.* at No. 156.)  The deposition testimony cited in support

---

    [2] The Handbook also provides for personal days "which may be combined with sick leave
time but may not exceed 120 days combined."  Like sick days, the Handbook does not provide
for payment of unused personal days.  (DE 38-38 (Marcus Aff. Ex. R at pp. 11.)

thereof is unclear as to what type of pay the three referenced EMS workers received.  For example, Cacace was asked if he was owed any sick, vacation, or leave time and he responded "I think I was paid for it."  Similarly, Miller was asked if when he left he was owed any unpaid leave or sick time and he answered, "They paid me everything I was owed."  Plaintiffs' brief also references other evidence, including the Handbook and Defendants' answers to interrogatories and deposition testimony  in support of  their "custom" (DE 36 at 19), but again these items do not support granting summary judgment that the District is liable to pay for accrued sick time or for vacation time accrued in years prior to separation.  Conspicuously absent is clear evidence of a District employee being paid for unused sick time or for vacation time accrued prior to the year of departure.  Similarly, there is no evidence  as to whether the District paid departing EMS employees for Holiday pay or whether only EMS employed on the payment dates in January and July were so paid.

Accordingly, the motion for summary judgment on liability for sick and vacation pay is granted solely as against the District for unused vacation, accrued in 2010, by any of the following plaintiffs: Etsch, Cruz, Collins, Mosby, Crawford, and Gobbo;[3] it is otherwise denied.

## V.    Plaintiffs' Retaliation Claim

### A.    Standard for FLSA Retaliation Claims

 The FLSA provides that it shall be unlawful for an employer "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has

---

[3] As noted, plaintiffs Cacace and Miller testified that they were paid whatever they were owed for vacation time.

13

testified or is about to testify in any such proceeding . . . ." 29 U.S.C. § 215(a)(3). "FLSA retaliation claims are subject to the [ *McDonnell Douglas* ] three-step burden-shifting framework." *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)); *see Perez v. G & P Auto Wash Inc.*, 930 F. Supp. 2d 423,436 (E.D.N.Y. 2013).

To establish a prima facie case of FLSA retaliation, a plaintiff must show: "(1) participation in protected activity known to defendant, like the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Mullins*, 626 F.3d at 53.   "[A] causal connection between an adverse action and a plaintiff's protected activity may be established through evidence of retaliatory animus directed against a plaintiff by the defendant . . . or by showing that the protected activity was closely followed in time by the adverse action." *Id.* (internal quotation marks and citations omitted.)  If the plaintiff is able to meet that standard, "the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the . . . action." *Id.* (internal quotation marks and citation omitted).  If the defendant is able to show a legitimate, non-discriminatory reason, "the plaintiff must produce sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Id.* at 53-54 (internal quotation marks and citation omitted).

The retaliation provision of the New York Labor Law is closely analogous and is analyzed under the same  burden-shifting analysis. *Higueros v. New York State Catholic Health Plan, Inc.,* 630 F. Supp. 2d 265, 269-71 (E.D.N.Y. 2009).

14

Where, as here, the question of whether the plaintiff has met his prima facie burden is indistinguishable from the question of whether the employer's actions merely served as a pretext for retaliation, "a court may simply assume that a plaintiff has established a prima facie case and skip to the final step in the *McDonnell Douglas* analysis." *Idrees v. City of New York*, 2009 WL 142107, at *9 (S.D.N.Y. Jan. 21, 2009) (citing cases); *see also Jimenez v. Donahoe*, 968 F. Supp. 2d 609, 618 (S.D.N.Y. 2013); *Howard v. MTA Metro-North Commuter R.R.*, 866 F. Supp. 2d 196, 205 (S.D.N.Y. 2011. This is because a plaintiff who can prevail at the third stage of the McDonnell Douglas process has necessarily demonstrated circumstances giving rise to an inference of discrimination, and a plaintiff who cannot prevail at the third stage cannot prevail on his/her claim whether or not there exist circumstances giving rise to an inference of discrimination. The Court will therefore assume plaintiff has demonstrated an inference of discrimination and move on to the final third stage of the *McDonnell Douglas* analysis. *See Morris v. Ales Grp. USA, Inc.*, 2007 WL 1893729, at *7 (S.D.N.Y. June 29, 2007).

Certainly, Plaintiff's have presented evidence that would permit a jury to find in their favor on their retaliation claims. Similarly, however, Defendants have presented evidence that would permit a jury to find that the institution of Article 75 charges and the State Court Action were not motivated by a retaliatory animus.

The filing of the complaint with the U.S. Department of Labor is protected activity and the filing of the Article 75 charges and the State Court action are adverse actions, even if they are not frivolous. *See Spencer v. Internat'l Shoppes, Inc.*, 2010 WL 1270173, * 12 (E.D.N.Y. Mar. 29, 2010). Within one month of the Department of Labor complaint, the District's accountant prepared a report regarding the alleged overpayments and several weeks later the Defendants

communicated their intention to file charges against Plaintiffs for alleged overpayments if they did not agree to pay them back.   There is also the nine month period between the District's learning of the "ghost day" in September 2009 and  advising the EMS employees in June 2010 they could face disciplinary charges.  Additionally, there are the memoranda issued by the District Manager instructing EMS personnel to make sure their time cards total 72 hours each bi-weekly period,  the change from a punch clock to written time cards, testimony that the EMS workers were salaried and not hourly employees, and that the District never exceeded its labor budget.  All of which support the implausibility of the District's claim that they had no knowledge of, and did not condone, the alleged overpayment.  This is just some of the evidence that supports an inference of a retaliatory motive.

On the other hand, there is also evidence from which a jury could conclude that retaliation did not motivate the District's decision to commence Article 75 charges and the State Court Action.  There is evidence Plaintiffs were hourly employees.  Plaintiffs' have admitted that the time cards they submitted were inaccurate and did not accurately reflect the number of hours they worked.  Each of the Individual Defendant testified they had no knowledge that EMS workers were paid for days they did not work.  There is also the accountant's review which demonstrates that Plaintiffs were paid for hours they did not work. Additionally, each of the Plaintiffs employed as of June 2010 resigned rather than face the charges of misconduct.  There is also the lack of evidence as to when the District learned of the Department of Labor complaint which diminishes any inference of retaliation.   The delay between September 2009 when the District learned of the "ghost" day and June 2010 when they advised the EMS workers of possible disciplinary charges could be explained by the time needed to review years of records,

the time needed to secure appropriate counsel and that the Board of Commissioners only met

once a month. In sum, there is sufficient evidence in the record to permit a jury to conclude that

the District's actions were motivated by their fiduciary obligation as guardians of the public fisc

to seek restitution of the funds wrongfully paid, i.e. not motivated by a retaliatory animus.

Drawing all inferences and resolving all ambiguities in favor of the non-movant

Defendants, the Court cannot say that no rational jury could find in their favor.  Accordingly,

Plaintiffs' motion for summary judgment on their retaliation claims is denied.

Having addressed Plaintiffs' motion for summary judgment, the Court now turns to

Defendants' motion.

## VI.    Defendants' Motion as to New York Labor Law 198-c

Relying upon *Stoganovic  v. Dinolfo*, 92 A.D.2d 729, 461 N.Y.S.2d 121 (4th Dep't 1983),

*aff'd*, 61 N.Y.2d 812, 473 N.Y.S.2d 972 (1984), Individual Defendants seek dismissal of the

claims against them as they are not "employers."

In *Stoganovic*,  the court found that "the provisions of [N.Y. Labor Law 198–a]

subjecting corporate officers to criminal sanctions for violation of [Article 6] indicates a

legislative intent that they not be subject to civil liability."  *Patrowich v. Chemical Bank*, 63

N.Y.2d 541, 483 N.Y.S.2d 659, 473 N.E.2d 11 (1984) (citing *Stoganovic*, 92 A.D.2d 729, 461

N.Y.S.2d 121).  Here, Plaintiffs claims against  the Individual Defendants include allegations that

they are employers, within the meaning of the New York Labor Law.  (*See* DE 1 at ¶ 19 (alleging

"Defendants were employers as defined by the FLSA and the NYLL").  This is important

"because courts have held that the rule set forth in *Stoganovic* is limited only to claims for unpaid

wages against officers or shareholders 'who do not qualify as employers' under Section 190(3).'"

*Lauria v. Hefferman*, 607 F. Supp. 2d 403, 408-09 (E.D.N.Y. 2009) (citing *Vysovsky v. Glassman*, 2007 WL 3130562, at *17 (S.D.N.Y. Oct. 23, 2007); *Chu Chung v. The New Silver Palace Restaurant*, 272 F. Supp. 2d 314, 318 (S.D.N.Y.2003); *Wong v. Yee*, 262 A.D.2d 254, 693 N.Y.S.2d 536 (1st Dep't 1999) (holding that shareholders may be sued under Article 6 provided that they qualify as employers within the meaning of Section 190(3)); *see also Dominquez v. B S Supermarket, Inc.*, 2015 WL 1439880 (E.D.N.Y. 2015).  Thus, the viability of the Plaintiffs' claims as to the Individual Defendants turns on whether the Individual Defendants are "employers" within the meaning of Section 190(3).

Section 190(3) broadly defines an "employer" as "any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business, or service." N.Y. Labor Law 190(3).  In analyzing whether a person is an employer, courts look to the "economic reality" test set forth in *Herman v. RSR Servs. Ltd*., 172 F.3d 132, 139 (2d Cir.1999). *See Chu Chung*, 272 F. Supp. 2d at 319 n. 6 (observing that the test for determining whether a person is an employer under Article 6 of the New York Labor Law is the same test used to determine employer status under the Fair Labor Standards Act as enunciated in *Herman*). The "economic reality" test looks to the following factors:  whether the alleged employer: (1) "had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; (4) and maintained employment records." *Herman*, 172 F.3d at 139. "No one of the four factors is dispositive," and the question of employer status turns upon "the totality of the circumstances." *Id*. "[T]he overarching concern is whether the alleged employer possessed the power to control the workers in question, with an eye to the 'economic realities' presented by the

facts of each case." *Id*. (citations omitted).

The Court must therefore determine whether Plaintiffs have submitted evidence sufficient to permit the finder of fact to conclude the Individual Defendants were employers so as to defeat Defendants' motion.

Plaintiffs point to evidence in the record such as that the District Commissioners approved hiring of EMS workers, set their pay rate, instituted Article 75 proceeding against them, were responsible for re-instituting the use of punch cards, and were responsible for general oversight of employees. (DE 44 at pp. 5-6.) However, as Defendants aptly point out, employment actions were taken by the Board of Commissioners as a whole and "[i]ndividually none of the Fire Commissioners . . . have the authority to control [Plaintiffs'] actions without the collective vote of the Board." (DE 48 at p. 2.)

As the court in *Coley v. Vannguard Urban Improvement Assoc., Inc.*, 2014 WL 4793825 (E.D.N.Y. Sept. 14, 2014) noted:

> This factual distinction is critical here because, under New York law, an individual board member is not empowered to act on behalf of its organization-only the board as a whole is-and voting members of boards are not liable for the acts of the board merely by virtue of their status as board members. *See, e.g., De Wald v. Amsterdam Housing Auth.*, 823 F. Supp. 94, 103 (N.D.N.Y.1993) (stating that a board member may not act on behalf of the organization in connection with employment matters unless "vested with independent authority to effectuate employment decisions"); *Walker v. Windsor Court Homeowners Ass'n*, 35 A.D.3d 725, 727–28, 827 N.Y.S.2d 214 (2d Dep't 2006) (noting that, although the defendants were members of the board, "none of them acted individually without the authority of a vote by the Board. Thus, they could not be held liable in their individual capacities [ .]").

*Id.* at * 4.

Here, there is no evidence that any of the Individual Defendants, acting individually as opposed to collectively, had either the power to or actually did hire or fire employees, supervise and control employee work schedules or conditions of employment, determine salary or maintain employment records.  Rather, the evidence is that either these action were undertaken by the Board of Commissioners as a whole or by managers who reported to the Board.  In other words, under the economic realities test, there is no evidence that would permit a trier of fact to find that any one of  the Individual Defendants was the "employer" of  Plaintiffs.  *See Coley*, 2014 WL 4793825, at * 4-5.  Accordingly, all claims[4] against Individual Defendants are dismissed.

## VII.    Defendants' Motion to Consolidate

Defendants have moved to consolidate the State Court Action with this action arguing that supplemental jurisdiction is appropriate as the claims asserted in the State Court Action and the claims asserted in this action share a common nucleus of operative facts.  More particularly, Defendants argue that the validity of the state court action form a substantial part of Plaintiffs' retaliation allegations and any overtime amounts that may be due Plaintiffs "must necessarily be offset by the amount owed to the Defendants for the paid for, yet unworked 'ghost day.' "  (DE 43-3  at p. 8.)

Plaintiffs do not object to the request for consolidation, stating that the two actions share a common nucleus of operative facts, it would be in the interest of judicial economy to consolidate both actions, and in the absence of consolidation there would be a risk of inconsistent verdicts.  (DE 44 at pp. 1-2.)

---

[4] As the economic reality test governs the issue of an employer under both the FLSA and New York Labor law, Plaintiffs' FLSA retaliation claims against the Individual Defendants must also be dismissed.

The motion to consolidate is denied.  The Court agrees that Defendants' claims in the State Court Action share a common nucleus of operative facts and had Defendants raised these claims in its answer to the complaint in this action,  supplemental jurisdiction would exist. However, Defendants did not assert these claims by way of counterclaims.  The parties do not cite, and the Court is unaware of, any authority under which this Court can consolidate an action presently pending in a state court with the action before it.[5]

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is granted in part and denied in part and Defendants' motion for partial summary judgment and consolidation is granted in part and denied in part.

Dated: Central Islip, New York
      May 4, 2015                          /s/  Denis R. Hurley_____
                                          Denis R. Hurley
                                          United States District Judge

---

[5] Rule 42 of the Federal Rules of Civil Procedure permits consolidation only of  "actions before the court."  Fed. R. Civ. P. 42.